PAUL J. COUCHOT State Bar No. 131934
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>CAMEO HOMES, INC., a California corporation,<br><br>Debtor and<br>Debtor-in-Possession. | Case No. **8:08-13151 RK**<br><br>Chapter 11<br><br>**DEBTOR'S MOTION FOR ORDER AUTHORIZING JOINT ADMINISTRATION OF RELATED CASES AND OF RELATED DEBTORS' INCOME AND EXPENSES PURSUANT TO 11 U.S.C. § 105 AND BANKRUPTCY RULE 1015(b); MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF JOHN MCFADDEN AND PAUL J. COUCHOT IN SUPPORT THEREOF**<br><br>Hearing Date: [Expedited Hearing Requested]<br>Hearing Time: [Expedited Hearing Requested] |

**TO THE HONORABLE ROBERT KWAN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES-IN-INTEREST:**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cameo Homes, Inc., a California corporation, the debtor and debtor-in-possession ("Debtor"), hereby moves the Court, on an emergency basis, for an order granting the following relief:

Authorizing the joint administration of the within Debtor's chapter 11 case with the related chapter 11 case of James C. Gianulias ("Gianulias" and Gianulias and Cameo are hereinafter collectively referred to as the "Related Debtors"), including the following:[1]

  (1) Combining the estates by using a single docket for administrative matters, and the filing, lodging and docketing of pleadings and orders;

  (2) Combining notices to creditors and parties-in-interest;

  (3) Scheduling joint hearings;

  (4) The joint handling of other administrative matters;

B. Authorizing the use of the caption attached as Exhibit "1" to the Declaration of Paul J. Couchot (the "Couchot Declaration") appended hereto;

C. Authorizing the consolidation and central administration of the Related Debtors' income and expenses during the pendency of their chapter 11 cases; and

D. Such other and further relief as the Court deems just and proper.

Several factors are present in the Related Debtors' cases that militate in favor of administrative consolidation. Gianulias owns an interest in a number of single asset real estate entities that were formed to purchase and develop real estate. Cameo also owns an interest in a number of single asset real estate ventures that were formed to purchase and develop real estate. Cameo holds an interest in many of the same real estate entities in which Gianulias holds an interest. Gianulias owns 100% of Cameo and therefore has an indirect interest in all of Cameo's interests in the various real estate entities. As a result, there is extensive overlap among the Related Debtors' assets and liabilities. (Among the most important are the following: (i) the Related Debtors centrally administer the management of the assets in which both the Related

---

[1] An identical motion is being filed in Gianulias' chapter 11 case.

1    Debtors own an interest, and allocate their income and expenses in connection with such joint

2    administration; (ii) they are co-obligors on numerous guarantees; and (iii) they have many

3    creditors in common.)  The Related Debtors have determined that the most efficient and effective

4    manner in which to administer the jointly owned assets during these chapter 11 cases is to continue

5    the Related Debtors' prepetition method of joint management and allocation of income and

6    expenses with respect to these assets.  The Related Debtors therefore request that this Court

7    authorize the Related Debtors to consolidate and centrally administer their cash flow during the

8    pendency of their chapter 11 cases.

9         Joint administration of these cases will also allow the Related Debtors to benefit from

10   increased efficiency because they will not be required to review and separately respond to similar

11   motions, disclosure statements, and other papers that would otherwise be filed in the separate

12   cases.  Joint administration will potentially save the Related Debtors' estates thousand of dollars in

13   administrative fees and costs, as well as save this Court numerous hours in setting and hearing

14   matters and in reviewing two separate sets of virtually identical pleadings.

15        The Related Debtors do not request substantive consolidation of their cases at this time.

16   Nothing contained in this Motion is intended to compel substantive consolidation of the assets of

17   the Related Debtors' respective estates or to modify the Related Debtors' ownership interests in

18   the real estate entities.  Since the Related Debtors request only joint administration of these cases,

19   and a continuation of the most efficient method of managing the Related Debtors' jointly owned

20   assets, no substantive rights will be prejudiced by the relief requested herein, and no conflicts will

21   result therefrom.  In the event a substantive consolidation of the assets and liabilities of the Related

22   Debtors' estates is warranted, the Related Debtors will bring a separate motion requesting such

23   relief.

24        This Motion is based on the attached Memorandum of Points and Authorities, the

25   Declaration of John McFadden (the "McFadden Declaration"), the Couchot Declaration, and all

26   pleadings, papers and records on file with the Court, and such other evidence, oral or documentary,

27   as may be presented to the Court with respect to this Motion.

28

1    Concurrently with the filing of this Motion, counsel for the Debtor served this Motion, via

2    expedited delivery, on the following parties: (1) the Office of the United States Trustee; (2) the

3    Official Committee of Creditors Holding Unsecured Claims appointed by the U.S. Trustee; (3) all

4    secured creditors; and (4) any party who filed a request for special notice in Cameo's case.  Once a

5    hearing on the Motion is scheduled, counsel for the Debtor will serve a notice of the hearing on

6    this Motion, via expedited delivery, on the above-referenced parties.

7    Based upon the foregoing arguments and authorities and the evidence before this Court, the

8    Debtor respectfully submits that the Court should enter an order authorizing joint administration of

9    the Related Debtors' estates, including:

10        (1)    Combining the estates by using a single docket for administrative matters,

11    and the filing, lodging and docketing of pleadings and orders;

12        (2)    Combining notices to creditors and parties-in-interest;

13        (3)    Scheduling joint hearings;

14        (4)    The joint handling of other administrative matters; and

15        (5)    The central administration of the Related Debtors' income and expenses

16    during the pendency of their chapter 11 cases.

17

18    DATED:  July 22, 2008                    **WINTHROP COUCHOT**

19                                             **PROFESSIONAL CORPORATION**

20
                                             By: _/s/ Paul J. Couchot_
21                                                Paul J. Couchot
                                                 [Proposed] Reorganization Counsel for the
22                                               Debtor and Debtor-in-Possession

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## BACKGROUND OF RELATED DEBTORS

### A.    Background

On June 6, 2008, three creditors of Cameo commenced an involuntary case against Gianulias under chapter 7 of the Bankruptcy Code. Concurrently, the same three creditors commenced an involuntary chapter 7 case against James C. Gianulias, which is being administered by this Court as Case No. 8:08-13150 RK.

On July 1, 2008, Gianulias and Cameo filed their respective Consents to the Entry of an Order for Relief and Election to Convert Chapter 7 case to case under Chapter 11 of the Bankruptcy Code.

On July 2, 2008, this Court entered Orders for Relief and converted Gianulias' and Cameo's cases to ones under Chapter 11.

No request has been made for the appointment of a trustee or examiner in either case.

### B.    Description of the Related Debtors

Gianulias is an individual in the business of real estate development. Gianulias owns an interest in a number of single asset real estate entities that were formed to purchase and develop real estate. Cameo also owns an interest in a number of single asset real estate ventures that were formed to purchase and develop real estate. Cameo holds an interest in many of the same real estate entities in which Gianulias holds an interest. Gianulias owns 100% of Cameo and therefore has an indirect interest in all of Cameo's interests in the various real estate entities. The real estate entities owned in part by Gianulias and Cameo include limited liability companies, general partnerships, and limited partnerships (collectively, the "Companies"). The Companies represent a substantial portion of the Related Debtors' assets.

Gianulias and Cameo established the Companies to own and operate various real estate assets, including, without limitation, condominiums, residential developments, commercial and retail developments, mixed-use developments, and multi-family apartment complexes (the

1    "Properties"). Of those various real estate assets, approximately fourteen (14) single family

2    residence projects, four (4) mixed-use projects and four (4) multifamily land development projects

3    are not generating income. Three (3) multifamily projects and one (1) commercial/retail project

4    remain under construction or are in lease-up status, and are not generating sufficient income to

5    cover operating costs and service their debt. Ten (10) multifamily projects and six (6)

6    commercial/retail projects have reached stabilization and are generating income.

7        Historically, G Companies Management, LLC ("G Companies") and certain affiliates have

8    provided the Companies with the management and administrative services necessary to ensure the

9    successful development, construction and management of the Properties. G Companies is owned

10   100% by Gianulias. The services provided by G Companies and certain affiliates to the

11   Companies include, but are not limited to, cash management, human resources and insurance

12   oversight, computer services and equipment, financing, construction and development oversight,

13   construction accounting, contract management, sales and marketing, and acquisitions and

14   dispositions.

15   **C.    The Related Debtors' Financial Condition**

16       While the Related Debtors' businesses span multiple states, a significant portion of the

17   Related Debtors' homebuilding operations are located in the state of California. The erosion in the

18   California homebuilding market during the second half of 2007 was unexpected and cataclysmic,

19   and it affected all homebuilding markets in California, including the markets in which the Related

20   Debtors operate. The result of the market erosion in values and slow down of absorption broadly

21   affected the Related Debtors' financial positions.

22       Both Gianulias and Cameo have guaranteed, in whole or in part, the outstanding secured

23   loans with respect to twenty-six (26) real estate ventures that do not generate positive cash flow.

24   Both Gianulias and Cameo have also guaranteed unsecured loans. Gianulias has personally

25   guaranteed loans totaling approximately $238,000,000. Cameo has also guaranteed loans totaling

26   approximately $210,000,000.

27   **D.    The Cash Flow Projection**

28       Although the expenses paid by the Related Debtors vary from month to month, attached to

1  the McFadden Declaration as Exhibit A is a Cash Flow Projection showing the Related Debtors'

2  anticipated income and expenses through August 31, 2008 (the "Cash Flow Projection").  The

3  Cash Flow Projection was prepared using the Related Debtors' historical data for the past several

4  months, then modified to account for certain recent changes in the Related Debtors' businesses as

5  a consequence of the changes in the homebuilding market including, but not limited to, a

6  reduction of the number of employees.  If the Related Debtors are required to make a payment that

7  materially exceeds the budgeted amounts set forth in the Cash Flow Projection, the Related

8  Debtors will inform this Court, the United States Trustee, and the creditors' committees in these

9  chapter 11 cases prior to making such payment.

10      1.    Income

11      The Related Debtors' primary sources of income are the distributions received from the

12  Companies.  While a number of the Properties are struggling financially due to adverse market

13  conditions several of the Properties, including a number of commercial and retail developments,

14  as well as multi-family apartment complexes, have reached stabilization and are generating

15  income.  As a result, on a monthly basis, the Companies make distributions to the Related Debtors

16  from income generated by the Properties.[2]  On average, Gianulias receives distributions in the

17  approximate amount of $288,000 per month and Cameo receives distributions in the approximate

18  amount of $178,000 per month.  The Related Debtors use the distributions received from the

19  Companies to, among other things, fund the Companies' operating expenses, including overhead

20  and services provided by G Companies.

21      Gianulias also receives a salary from Cameo for his services as chairman of Cameo.

22  Gianulias provides management and oversight of Cameo's business operations and the services

23  provided by G Companies and its employees.  Additionally, Gianulias provides services essential

24  to the development of Cameo's business plans and is assisting Cameo in maximizing the value of

25  its assets.

26      Finally, the Cash Flow Projection reflects the return of funds from Phoenix - Issa Strategic

27

28  [2] Prior to the Petition Date, the Companies made quarterly, rather than monthly, distributions to the Related Debtors.

1   Partners, LLC ("Issa Phoenix") in the amount of $75,000 to Cameo and $75,000 to Gianulias.

2   Prior to the Petition Date, the Related Debtors utilized the services of Issa Phoenix in connection

3   with the valuation of the Properties, lender negotiations and other related matters.  As a result of

4   the chapter 11 filings, the Related Debtors no longer require the same level of services from Issa

5   Phoenix, as many of these services will now be provided by bankruptcy related professionals.

6   Therefore, the Related Debtors requested the return of the majority of the retainer that was

7   previously provided to Issa Phoenix.

8         2.    Expenses

9        The Related Debtors' expenses fall within three broad categories: (i) business expenses

10   incurred by G Companies on behalf of the Companies; (ii) professional fees relating to their

11   chapter 11 cases; and (iii) direct expenses of Gianulias and Cameo.  Each of these categories will

12   be discussed in detail below.

13        Gianulias and Cameo each independently pay their direct expenses.  However, with respect

14   to professional fees relating to the bankruptcy and business expenses paid by G Companies, these

15   expenses are consolidated.  Gianulias pays 70% of the consolidated expenses and Cameo pays

16   30%.  This ratio reflects the split of distributions received by Gianulias and Cameo from the

17   Companies.  On average, Gianulias receives approximately 70% of the distributions from the

18   Companies and Cameo receives approximately 30%.

19        For the reasons set forth below, it would not be a prudent use of the Related Debtors'

20   assets to attempt to allocate these expenses between the Related Debtors, and any allocation would

21   be artificial since the management and administration of the assets are performed by the same

22   individuals.  Therefore, the Related Debtors submit that it is in the best interests of the Related

23   Debtors, their creditors and their estates to allow the Related Debtors to consolidate and centrally

24   administer their cash flow during the pendency of their chapter 11 cases.

25                 G Companies Business Expenses

26        As discussed above, historically, G Companies and certain affiliates have provided the

27   Companies with the management and administrative services necessary to ensure the successful

28   development, construction and management of the Properties.  The services provided by G

Companies and certain affiliates to the Companies include, but are not limited to, cash management, human resources and insurance oversight, computer services and equipment, financing, construction and development oversight, construction accounting, contract management, sales and marketing, and acquisitions and dispositions.

In exchange for these critical services, the Related Debtors transfer funds to G Companies on a bi-weekly and/or as-needed basis to cover its business expenses, which include, without limitation, payroll for approximately eleven (11) employees and four (4) consultants,[3] payroll burden, rent, and general administrative expenses.[4] Those Companies that are generating income then reimburse the Related Debtors for their allocated portion of these expenses. With respect to those Companies which are not yet generating income, the Related Debtors recover those Company's allocable share of operating expenses once the entity begins to generate income, or is either sold or recapitalized.

Moreover, during the pendency of the bankruptcy cases, G Companies' employees have been providing, and will continue to provide, corporate level support to the Related Debtors in connection with the Chapter 11 cases and all tax and accounting matters. G Companies provides oversight of the Related Debtors' business operations, as well as participating in the development of the Related Debtors' business plans and strategies and in negotiations concerning the Related Debtors' financial restructuring activities and implementation thereof. At this time, G Companies is assisting the Related Debtors in finalizing several transactions involving Properties located in Murrieta, California.

In the past year, the aggregate amount transferred to G Companies in order to pay the costs associated with its business expenses totaled approximately $517,000 per month. Due to reductions in payroll and other expenses, based on the Cash Flow Projection, on a going-forward basis that G Companies will require approximately $160,000 per month in order to continue to

---

[3] In light of the bankruptcy filings, and in order to avoid unnecessary expenditures that would deplete valuable assets of the estate, G Companies has significantly reduced its workforce and payroll from approximately $273,000 per month in December 2007 to approximately $69,000 per month in August 2008.

[4] G Companies makes draws from the Related Debtors' accounts on a bi-weekly and/or as-needed basis to fund the regular business expenses, such as payroll, it incurs as result of those services it provides to the Companies. Invoices are not used for routine bi-weekly overhead, but unplanned expenses are invoiced and documented.

1   operate.  The Cash Flow Projection anticipates that Gianulias will pay 70% of the foregoing

2   expenses and Cameo will pay 30%.

3           Many of these expenses are incurred by G Companies in providing services that ultimately

4   benefit both of the Related Debtors.  It would be extremely difficult and time-consuming to

5   allocate between the Related Debtors the various expenses incurred by G Companies on behalf of

6   the Companies.  In order to determine what services benefit Cameo, as opposed to Gianulias, or

7   visa versa, the Related Debtors would need to allocate each expense incurred by G Companies

8   among the Companies, then determine the Related Debtors' ownership of each of the Companies.

9   This process would be exceedingly complex and would, of necessity, be artificial.  For example, G

10  Companies would be required to determine how much time each employee of G Companies spent

11  providing services to each of the Companies.  It would not be a prudent use of the Related

12  Debtors' assets to attempt to differentiate between these expenses.  Therefore, it is reasonable for

13  Gianulias to pay 70% and Cameo to pay 30% of the foregoing expenses.

14                                           Professional Fees

15          The second broad category reflected in the Related Debtors' Cash Flow Projection is

16  comprised of professional fees relating to the Related Debtors' chapter 11 cases.  Included in this

17  category are fees to pay the Related Debtors' insolvency counsel, as well as fees relating to BMC

18  Group, which is assisting the Related Debtors in preparing their schedules and complying with the

19  requirements of the United States Trustee, and other professionals necessary to assist the Related

20  Debtors in maximizing the value of their assets for the benefit of their creditors.  The Related

21  Debtors have estimated professional fees and retainers will potentially exceed $1 million for the

22  period July through September 2008.

23          There is extensive overlap among the Related Debtors' assets, liabilities and use of cash.

24  Among the most important are the following: (i) the Related Debtors centrally administer the

25  management of the assets in which both the Related Debtors own an interest, and allocate their

26  income and expenses in connection with such joint administration; (ii) they are co-obligors on

27  numerous guarantees; and (iii) they have many creditors in common.  Therefore, many of the

28  services provided by the professionals will benefit both of the Related Debtors.  Due to this

1  overlap, it would be extremely time-consuming to allocate the various services provided by the

2  professionals between Gianulias and Cameo.  Therefore, it is reasonable for Gianulias to pay 70%

3  and Cameo to pay 30% of the foregoing expenses.

4      Where a professional is employed by one, but not both, of the Related Debtors, however,

5  no allocation would be appropriate, or necessary.

6                              Direct Expenses

7      Both Gianulias and Cameo also have certain direct expenses which are paid independently

8  by each of the Related Debtors, however, the majority of Cameo's direct expenses are comprised

9  of payroll and related expenses, as well as costs incurred in connection with Cameo's computer

10  system, functions which benefit both Gianulias and Cameo.  Although G Companies provides the

11  majority of services to the Companies, Cameo employs two individuals, including Gianulias, to

12  oversee the management of G Companies and the Companies.  These individuals provide

13  management and oversight of Cameo's business operations and the services provided by G

14  Companies and its employees.  Additionally, Gianulias provides services essential to the

15  development of Cameo's business plans and is assisting Cameo in maximizing the value of its

16  assets.  Cameo requires approximately $50,000 per month in order to operate.

17      At this time, Cameo is currently securing and completing transactions involving several

18  assets in which both of the Related Debtors have an interest.  These transactions may increase the

19  value of the Related Debtors' estates by several million dollars, as well as benefiting the Related

20  Debtors by reducing their contingent guarantee liability.  The Related Debtors estimate that these

21  transactions will be completed between August 2008 and February 2009.

22      Gianulias' direct expenses consist of several categories.  First, Gianulias makes mortgage

23  payments and pays other direct expenses on certain directly owned assets, including property

24  taxes, homeowner association fees, maintenance and other services, and utilities.[5]  Gianulias also

25  directly pays certain business expenses, including costs associated with trade publications,

26  membership dues, business meals and membership facilities used for entertainment and business

27  _____

28  [5] Certain of the properties owned by Gianulias have been rented.  This rental income is applied to costs associated with the properties.

1  development.  Finally, Gianulias has certain personal expenses, including insurance, medical bills

2  and other personal expenses.  All of these items are paid directly by Gianulias, and not allocated

3  between the Related Debtors.

4                                      **II.**

5                            **RELIEF REQUESTED**

6          By this Motion, Cameo is requesting an order authorizing joint administration of its case

7  with that of Gianulias (wherein an identical motion is being filed concurrently).

8          As set forth in this Motion, there is substantial overlap with respect to the Related Debtors.

9  In light of this overlap, the Related Debtors believe that joint administration will avoid otherwise

10  unnecessary and expensive duplication of effort and papers caused by preparing and serving the

11  same creditors with multiple sets of differently-captioned but otherwise identical papers.  The

12  relief proposed herein will enable these estates to avoid the substantial cost of preparation, filing

13  and serving duplicative motions in each case, and the consequent burden on the estates and the

14  Court.

15          By jointly administering the Related Debtors' estates, creditors will receive appropriate

16  notice of matters involving each of the Related Debtors, thereby ensuring that creditors are fully

17  informed of matters potentially affecting their claims.  In short, joint administration of the Related

18  Debtors' cases, including (i) the use of a single pleadings docket, (ii) the combining of notices to

19  creditors of the different estates, and (iii) the joint handling of other administrative matters will aid

20  in expediting the cases and rendering the process substantially less costly, without prejudicing the

21  substantive rights of any creditor.

22          Several factors are present in the Related Debtors' cases that militate in favor of central

23  administration of the Related Debtors' income and expenses.  As set forth above, there is extensive

24  overlap among the Related Debtors' assets and liabilities.  Among the most important are the

25  following: (i) the Related Debtors centrally administer the management of the assets in which both

26  the Related Debtors own an interest, and allocate their income and expenses in connection with

27  such joint administration; (ii) they are co-obligors on numerous guarantees; and (iii) they have

28  many creditors in common.  The Related Debtors have determined that it will be difficult and

1  time-consuming to allocate income and expenses relating to the Companies between the Related

2  Debtors, and any such allocation would be, of necessity, artificial.  Moreover, revamping the

3  Companies' entire management and financial structure would result in disruption and delay to the

4  Companies, from whom the Related Debtors' receive substantially of all their income, with no

5  corresponding benefit.  The Related Debtors and their creditors need certainty and stability as they

6  enter these bankruptcy proceedings, and the continued central administration of the Related

7  Debtors' cash flow is crucial to the Related Debtors' ability to manage the Companies and

8  administer their bankruptcy cases in an efficient and effective manner.

9      The Related Debtors believe that it is in the best interest of their estates to jointly

10  administer their chapter 11 cases, as set forth in this Motion.

11                                                    **III.**

12  **JOINT ADMINISTRATION OF THE RELATED DEBTORS' CASES WOULD YIELD**

13                  **SUBSTANTIAL ADMINISTRATIVE BENEFITS**

14      Although the Bankruptcy Code specifically provides for joint administration of limited

15  types of cases (See 11 U.S.C. § 302(a) (permitting the filing of joint petitions by spouses)), there is

16  no provision in the Code governing joint administration of cases generally.  Bankruptcy Rule

17  1015(b), however, makes clear that joint administration may be appropriate when two or more

18  related debtor entities, whether spouses, partnerships, or corporations, have filed for protection

19  under the Code.  Bankruptcy Rule 1015 provides, inter alia:

20          (b)     Cases Involving Two or More Related Debtors.  If a joint petition or

21      two or more petitions are pending in the same court by or against . . . a debtor and

22      an affiliate, the court may order a joint administration of the estates . . .

23                                         * * *

24          (c)     Expediting and Protective Orders.  When an order for . . . joint

25      administration of a joint case or two or more cases is entered pursuant to this rule,

26      while protecting the rights of the parties under the Code, the court may enter orders

27      as may tend to avoid unnecessary costs and delay.

28  Fed. R. Bankr. P. 1015(b) and (c).

1   Bankruptcy Rule 1015 promotes the fair and efficient administration of related cases of

2   affiliated debtors, while ensuring that no rights of individual creditors are unduly prejudiced.

3   See 9 Collier on Bankruptcy, ¶ 1015.03 (15th ed. rev. 2004); See also In re N.S. Garrott & Sons,

4   63 B.R. 189, 191 (Bankr. E.D. Ark. 1986); In re H & S Transportation Co., 55 B.R. 786, 791

5   (Bankr. M.D. Tenn. 1985).  As set forth in the official 1983 Advisory Committee Note to Rule

6   1015:

7   　　　Joint administration as distinguished from consolidation may include

8   　　　combining the estates by using a single docket for the matters occurring in the

9   　　　administration, including the listing of filed claims, the combining of notices to

10  　　　creditors of the different estates, and the joint handling of other purely

11  　　　administrative matters that may aid in expediting the cases and rendering the

12  　　　process less costly.

13  　　　Joint administration differs significantly from substantive consolidation, in which the

14  assets and liabilities are pooled and, generally, the creditors of the separate entities share pro rata

15  in the aggregate net value of the estates.  See In re Standard Brands Paint Co., 154 B.R. 563

16  (Bankr. C.D. Cal. 1993); In re I.R.C.C., Inc., 105 B.R. 237, 241 (Bankr. S.D.N.Y. 1989).  Joint

17  administration, by contrast, is merely procedural, and has no impact on the substantive rights of

18  creditors.  Garrott, 63 B.R. at 191; In re Arnold, 33 B.R. 765, 767 (Bankr. E.D.N.Y. 1983).  Thus,

19  joint administration does not prejudice the rights of any creditor.

20  　　　Moreover, pursuant to section 105(a) of the Bankruptcy Code, "the court may issue any

21  order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

22  11 U.S.C. § 105(a).  The basic purpose of section 105(a) is "to assure the bankruptcy courts power

23  to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction."  2

24  COLLIER ON BANKRUPTCY, § 105.01 (15th ed. rev. 2007).  Essentially, section 105(a) codifies the

25  bankruptcy court's equitable powers.

26  　　　Joint administration is warranted in the Related Debtors' cases.  Based on the relationship

27  between Gianulias and Cameo, it is clear that Related Debtors are "related" and are "affiliate[s]"

28  as those terms are used in the Bankruptcy Code.  See 11 U.S.C. § 101(2).

1      Joint administration will substantially reduce the costs of administering the Related

2   Debtors' cases and will serve to eliminate the inefficiency created by maintaining separate dockets.

3   To a great extent, for each set of pleadings to be filed in the Related Debtors' cases, the only

4   material differences between each pleading will be in the captions; since substantive matters

5   affecting one estate typically will affect the other estate.  Without joint administration, separate

6   pleadings must be filed in each matter, and unnecessary duplication will need to be done at

7   substantial cost to the estates -- all without any additional benefit to creditors or interest holders.

8      Moreover, the creditors of the Related Debtors stand to benefit from the increased

9   efficiency of administration anticipated through joint administration because they will not be

10   required to review and separately respond to substantially similar motions, disclosure statements,

11   and other pleadings that would otherwise be filed in separate cases.

12      The Related Debtors have determined that it will be difficult and time-consuming to

13   allocate income and expenses relating to the Companies between the Related Debtors.  Moreover,

14   revamping the Companies' entire management and financial structure would result in disruption

15   and delay to the Companies, from whom the Related Debtors' receive substantially of all their

16   income, with no corresponding benefit.  There will be no prejudice to creditors because the

17   Related Debtors will not make a payment that materially exceeds the budgeted amounts set forth in

18   the Cash Flow Projection without informing this Court, the United States Trustee and the

19   creditors' committees in these chapter 11 cases prior to making such payment.  Therefore, it is in

20   the best interests of the Related Debtors' creditors to authorize the Related Debtors to centrally

21   administer their cash flow during the pendency of their chapter 11 cases.

22                                    **IV.**

23   **WERE AN ACTUAL CONFLICT TO ARISE IN THE COURSE OF THE RELATED**

24   **DEBTORS' CASES, THE COURT MAY ALLEVIATE ANY PREJUDICE TO**

25   **CREDITORS PURSUANT TO ITS DISCRETION UNDER BANKRUPTCY RULE 1015(c)**

26      Although the Related Debtors do not believe that an actual conflict currently exists

27   between the estates, should such a conflict arise in the future, the Court could easily alleviate any

28   prejudice it may cause to creditors through the Court's broad powers to oversee the joint

1  administration of the Related Debtors' cases.  As discussed above, joint administration is a

2  procedural device designed to reduce costs and administrative burdens generally.  Were a conflict

3  to arise during the cases, the Court may limit joint administration to the extent necessary to

4  alleviate any negative effects of the conflict.  Under Bankruptcy Rule 1015(c), "while protecting

5  the rights of parties under the Code, the court may enter orders as may tend to avoid unnecessary

6  costs and delay."  Exercising its discretion under this Rule, the Court would be able to promote the

7  interests of the estates through administrative efficiency, while at the same time protecting the

8  rights of individual creditors and interest holders if and when the need arises.  Until an actual

9  conflict arises, however, there is no reason why the Court should not authorize joint administration

10  as sought in this Motion.

11  <center>**V.**</center>

12  <center>**<u>CONCLUSION</u>**</center>

13  The primary goal of a chapter 11 reorganization is to maximize the value of a debtor's

14  estate for the benefit of creditor and equity constituencies.  Related to that goal, and of significant

15  importance as well, is the efficient administration of the bankruptcy case so that the debtor can

16  emerge quickly and begin distributions to creditors.  Both of these goals will be furthered by

17  permitting the joint administration of the Related Debtors' cases as sought in this Motion.

18  Based upon the foregoing arguments and authorities and the evidence before this Court, the

19  Debtor respectfully submits that the Court should enter an order authorizing joint administration of

20  the Related Debtors' estates, including:

21  (1)     Combining the estates by using a single docket for administrative matters,

22  and the filing, lodging and docketing of pleadings and orders;

23  (2)     Combining notices to creditors and parties-in-interest;

24

25

26

27

28

<center>-16-</center>

1

2          (3)      Scheduling joint hearings;

3          (4)      The joint handling of other administrative matters; and

4          (5)      The central administration of the Related Debtors' income and expenses

5   during the pendency of their chapter 11 cases.

6   DATED: July 23, 2008                          WINTHROP COUCHOT

7                                                 PROFESSIONAL CORPORAITON

8
                                                  By: /s/ Paul J. Couchot
9                                                     Paul J. Couchot

10                                                [Proposed] Reorganization Counsel for Debtor
                                                  and Debtor-in-Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF PAUL J. COUCHOT

I, Paul J. Couchot, hereby declare and state as follows:

1.      I am a shareholder of the law firm of Winthrop Couchot Professional Corporation, proposed reorganization counsel for Cameo Homes ("Cameo" or "Debtor").

2.      On June 6, 2008, three creditors of Gianulias commenced an involuntary case against Cameo under chapter 7 of the Bankruptcy Code.  Concurrently, the same three creditors commenced an involuntary chapter 7 case against James C. Gianulias, which is being administered by this Court as Case No. 8:08-13150 RK.

3.      On July 1, 2008, the Debtor and Gianulias filed their respective Consents to the Entry of an Order for Relief and Election to Convert Chapter 7 case to case under Chapter 11 of the Bankruptcy Code.

4.      On July 2, 2008, this Court entered Orders for Relief and converted Gianulias' and Cameo's cases to ones under chapter 11.  No request has been made for the appointment of a trustee or examiner in either case.

5.      This Declaration is made in support of the "Debtor's Emergency Motion for Order Authorizing Joint Administration of Related Cases and of Related Debtors' Income and Expenses Pursuant to 11 U.S.C. § 105 and Bankruptcy Rule 1015(b)" (the "Motion").   As set forth in the Motion, I believe that joint administration will substantially reduce the costs of administering the Related Debtors' cases and will serve to eliminate the inefficiency created by maintaining separate dockets.  To a great extent, for each set of pleadings to be filed in the Related Debtors' cases, the only material differences between each pleading will be in the captions; since substantive matters affecting one estate typically will affect the other estate.  Without joint administration, separate pleadings must be filed in each matter, and unnecessary copying will need to be done at substantial cost to the estates -- all without any additional benefit to creditors or interest holders.

6.      As set forth in the Motion, there is substantial overlap with respect to the Related Debtors.  In light of this overlap, I believe that joint administration will avoid otherwise unnecessary and expensive duplication of effort and papers caused by preparing and serving the

1  same creditors with multiple sets of differently-captioned but otherwise identical papers. The

2  relief proposed herein will enable these business entities to avoid the substantial cost of

3  preparation, filing and serving duplicative motions in each proceeding, and the consequent burden

4  on the estates and the Court.

5      7.    By jointly administering the Related Debtors' estates, creditors will receive

6  appropriate notice of matters involving each of the Related Debtors, thereby ensuring that creditors

7  are fully informed of matters potentially affecting their claims. In short, joint administration of the

8  Related Debtors' cases, including (i) the use of a single pleadings docket, (ii) the combining of

9  notices to creditors of the different estates, and (iii) the joint handling of other purely

10 administrative matters will aid in expediting the cases and rendering the process substantially less

11 costly, without prejudicing the substantive rights of any creditor.

12     8.    I believe that the creditors of the Related Debtors stand to benefit from the increased

13 efficiency of administration anticipated through joint administration because they will not be

14 required to review and separately respond to substantially similar motions, disclosure statements,

15 and other pleadings that would otherwise be filed in separate cases. Joint administration will

16 potentially save the Related Debtors' estates thousand of dollars in administrative fees and costs,

17 as well as save this Court numerous hours in setting and hearing matters and in reviewing two

18 separate sets of virtually identical pleadings.

19     9.    The Related Debtors propose that all pleadings relating to the Related Debtors' cases

20 shall contain a joint caption in substantially the form attached hereto as Exhibit "1," and that all

21 such pleadings shall be filed and maintained under the existing docket of James C. Gianulias, Case

22 No. 8:08-bk-13150 RK.

23     10.   Nothing contained in the Motion is intended to compel substantive consolidation of

24 the Related Debtors' respective estates. Since the Related Debtors request only joint

25 administration of these cases, and of the Related Debtors' income and expenses, by this Motion,

26 approval of the Motion is the best manner in which to effectually and efficiently administer

27 Gianulias' estate, and the estate of his related debtor, Cameo. In the event a substantive

28

consolidation of the assets and liabilities of the Related Debtors' estates is warranted, the Related Debtors will bring a separate motion requesting such relief.

11.    Accordingly, for the reasons set forth in the Motion, I believe that it is in the best interest of the estate to jointly administer this case and that of Cameo (wherein an identical Motion is being filed), as set forth in this Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of July 2008, at Newport Beach, California.

*/s/ Paul J. Couchot*
Paul J. Couchot

1

**EXHIBIT "1"**

2

William N. Lobel (State Bar No. 93202) – wlobel@irell.com
Alan J. Friedman (State Bar No. 132580) – afriedman@irell.com

3

Kerri A. Lyman  (State Bar No. 241615) – klyman@irell.com
Issa K. Moe (State Bar No. 254998) – imoe@irell.com

4

IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400

5

Newport Beach, California 92660-6324
Telephone:  (949) 760-0991

6

Facsimile:   (949) 760-5200

7

[Proposed] Attorneys for James C. Gianulias

8

Paul J. Couchot (State Bar No. 131934)

9

**WINTHROP COUCHOT P.C.**
660 Newport Center Drive, 4th Floor

10

Newport Beach, CA 92660-5946
Telephone: (949) 720-4100

11

Facsimile:    (949) 720-4111
pcouchot@winthropcouchot.com

12

13

[Proposed] Attorneys for Cameo Homes

14

15

16

**UNITED STATES BANKRUPTCY COURT**

17

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

18

| | |
|---|---|
| In re | Case No. 8:08-bk-13150-RK |
| JAMES C. GIANULIAS, | Jointly Administered With:<br>Case No. 8:08-BK-13151-RK |
| Debtor and Debtor-in-Possession. | Chapter 11 |
| CAMEO HOMES, a California corporation, | |
| Debtor and Debtor-in-Possession. | |
| Affects:<br>☐ Both Debtors<br>☐ James C. Gianulias;<br>☐ Cameo Homes | |

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "1"**

1

## DECLARATION OF JOHN MCFADDEN

2      I, John McFadden, hereby declare and state as follows:

3      1.      I am the Corporate Controller of G Companies Management, LLC ("G

4  Companies") and provide services to various entities in which James C. Gianulias ("Gianulias")

5  has an interest, including Cameo Homes, a California corporation ("Cameo" and, collectively with

6  Cameo, the "Related Debtors").  In my position as Corporate Controller, I provide oversight of all

7  accounting services and tax related matters for Gianulias, Cameo, G Companies and various

8  related entities.

9      2.      I have general knowledge of the Related Debtors' books and records, and I am

10  familiar with the Related Debtors' financial and operational affairs.  As to the following facts, I

11  know them to be true of my own knowledge, or I have gained such knowledge from the business

12  records of Gianulias or one of his businesses which were made at or near the time of the acts,

13  conditions or events to which they relate.  Any such document or record was prepared in the

14  ordinary course of business by a person who had personal knowledge of the event being recorded

15  and had a business duty to accurately record such event.

16      3.      I submit this declaration in support of the *Debtor's Motion For  Order Authorizing*

17  *Joint Administration Of Related Cases And Of Related Debtors' Income And Expenses Pursuant*

18  *To 11 U.S.C. § 105 And Bankruptcy Rule 1015(b)* (the "Motion").[6]  I am authorized by the Related

19  Debtors to submit this Declaration.

20  **A.      Description of the Related Debtors**

21      4.      Gianulias is an individual in the business of real estate development.  Gianulias

22  owns an interest in a number of single asset real estate entities that were formed to purchase and

23  develop real estate.  Cameo also owns an interest in a number of single asset real estate ventures

24  that were formed to purchase and develop real estate.  Cameo holds an interest in many of the

25  same real estate entities in which Gianulias holds an interest.  Gianulias owns 100% of Cameo and

26  therefore has an indirect interest in all of Cameo's interests in the various real estate entities.  The

27  _____

28  [6] All capitalized terms not defined herein have the meaning set forth in the Motion.

1    real estate entities owned in part by Gianulias and Cameo include limited liability companies,

2    general partnerships, and limited partnerships (collectively, the "Companies").   The Companies

3    represent a substantial portion of the Related Debtors' assets.

4           5.      Gianulias and Cameo established the Companies to own and operate various real

5    estate assets, including, without limitation, condominiums, residential developments, commercial

6    and retail developments, mixed-use developments, and multi-family apartment complexes (the

7    "Properties").  Of those various real estate assets, approximately fourteen (14) single family

8    residence projects, four (4) mixed-use projects and four (4) multifamily land development projects

9    are not generating income.  Three (3) multifamily projects and one (1) commercial/retail project

10   remain under construction or are in lease-up status, and are not generating sufficient income to

11   cover operating costs and service their debt.  Ten (10) multifamily projects and six (6)

12   commercial/retail projects have reached stabilization and are generating income.

13          6.      Historically, G Companies and certain affiliates have provided the Companies with

14   the management and administrative services necessary to ensure the successful development,

15   construction and management of the Properties.  G Companies is owned 100% by Gianulias.  The

16   services provided by G Companies and certain affiliates to the Companies include, but are not

17   limited to, cash management, human resources and insurance oversight, computer services and

18   equipment, financing, construction and development oversight, construction accounting, contract

19   management, sales and marketing, and acquisitions and dispositions.

20   **B.      The Related Debtors' Financial Condition**

21          7.      While the Related Debtors' businesses span multiple states, a significant portion of

22   the Related Debtors' homebuilding operations are located in the state of California.  The erosion in

23   the California homebuilding market during the second half of 2007 was unexpected and

24   cataclysmic, and it affected all homebuilding markets in California, including the markets in which

25   the Related Debtors operate.  The result of the market erosion in values and slow down of

26   absorption broadly affected the Related Debtors' financial position.

27          8.      Both Gianulias and Cameo have guaranteed, in whole or in part, the outstanding

28   secured loans with respect to twenty-six (26) real estate ventures that do not generate positive cash

flow.  Both Gianulias and Cameo have also guaranteed unsecured loans.  Gianulias has personally guaranteed loans totaling approximately $238,000,000.  Cameo has also guaranteed loans totaling approximately $210,000,000.

C.    **The Budget**

9.    Although the expenses paid by the Related Debtors on behalf of the Companies may vary from month to month, attached hereto as <u>Exhibit A</u> hereto is a Cash Flow Projection showing the Related Debtors' anticipated income and expenses through August 31, 2008 (the "Cash Flow Projection").  I was personally involved in preparing the Cash Flow Projection and submit that the information contained in the Cash Flow Projection is reasonable and accurate to the best of my knowledge.  The Cash Flow Projection was prepared using the Related Debtors' historical data for the past several months, then modified to account for certain recent changes in the Related Debtors' businesses as a consequence of the changes in the homebuilding market including, but not limited to, a reduction of the number of employees.  Should the Related Debtors be required to make a payment that materially exceeds the amounts set forth in the Cash Flow Projection, the Related Debtors will inform this Court, the United States Trustee, and the creditors' committees in these chapter 11 cases prior to making such payment.

<div align="center">

**Income**

</div>

10.    The Related Debtors' primary sources of income are distributions received from the Companies.  While a number of the Properties are struggling financially due to adverse market conditions, several of the Properties, including a number of commercial and retail developments, as well as multi-family apartment complexes, have reached stabilization and are generating income.  As a result, on a quarterly basis, the Companies make distributions to the Related Debtors from income generated by the Properties.[7]  On average, Gianulias receives distributions in the approximate amount of $288,000 per month and Cameo receives distributions in the approximate amount of $178,000 per month.  The Related Debtors use the distributions received from the

---

[7] Prior to the Petition Date, the Companies made quarterly, rather than monthly, distributions to the Related Debtors.

1  Companies to, among other things, fund the Companies' operating expenses, including overhead

2  and services provided by G Companies.

3        11.    Gianulias also receives a salary from Cameo for his services as chairman of Cameo.

4  Gianulias provides management and oversight of Cameo's business operations and the services

5  provided by G Companies and its employees.  Additionally, Gianulias provides services essential

6  to the development of Cameo's business plans and is assisting Cameo in maximizing the value of

7  its assets.

8        12.    Finally, the Cash Flow Projection reflects the return of funds from Phoenix - Issa

9  Strategic Partners, LLC ("Issa Phoenix") in the amount of $75,000 to Cameo and $75,000 to

10 Gianulias.  Prior to the Petition Date, the Related Debtors utilized the services of Issa Phoenix in

11 connection with the valuation of the Properties, lender negotiations and other related matters.  As a

12 result of the chapter 11 filings, the Related Debtors no longer require the same level of services

13 from Issa Phoenix, as many of these services will now be provided by bankruptcy related

14 professionals.  Therefore, the Related Debtors requested the return of the majority of the retainer

15 that was previously provided to Issa Phoenix.

16 **Expenses**

17       13.    The Related Debtors' expenses fall within three broad categories: (i) professional

18 fees relating to their chapter 11 cases; (ii) business expenses paid by G Companies on behalf of the

19 Companies; and (iii) direct expenses of Gianulias and Cameo.  Each of these categories will be

20 discussed in detail below.

21       14.    Gianulias and Cameo each independently pay their direct expenses.  However, with

22 respect to professional fees and business expenses paid by G Companies, these expenses are

23 consolidated and Gianulias pays 70% of the consolidated expenses and Cameo pays 30%.  This

24 ratio reflects the split of distributions received by Gianulias and Cameo from the Companies.  On

25 average, Gianulias receives approximately 70% of the distributions from the Companies and

26 Cameo receives approximately 30%.  Therefore, I believe that it is reasonable for Gianulias to pay

27 70% and Cameo to pay 30% of the foregoing expenses.

28

15.    For the reasons set forth below, I do not believe that it would be a prudent use of the Related Debtors' assets to attempt to allocate these expenses between the Related Debtors, and that any allocation would be artificial since the management and administration of the assets are performed by the same individuals. Therefore, I believe that it is in the best interests of the Related Debtors, their creditors and their estates to allow the Related Debtors to consolidate and centrally administer their cash flow during the pendency of their chapter 11 cases.

### G Companies Business Expenses

16.    As discussed above, historically, G Companies and certain affiliates have provided the Companies with the management and administrative services necessary to ensure the successful development, construction and management of the Properties. The services provided by G Companies and certain affiliates to the Companies include, but are not limited to, cash management, human resources and insurance oversight, computer services and equipment, financing, construction and development oversight, construction accounting, contract management, sales and marketing, and acquisitions and dispositions.

17.    In exchange for these critical services, the Related Debtors transfer funds to G Companies on a bi-weekly and/or as-needed basis to cover its business expenses, which include, without limitation, payroll for approximately eleven (11) employees and four (4) consultants,[8] payroll burden, rent, and general administrative expenses.[9] Those Companies that are generating income then reimburse the Related Debtors for their allocated portion of these expenses. With respect to those Companies which are not yet generating income, the Related Debtors recover those Company's allocable share of operating expenses once the entity begins to generate income, or is either sold or recapitalized.

18.    Moreover, during the pendency of the bankruptcy cases, G Companies' employees have been providing, and will continue to provide, corporate level support to the Related Debtors

---

[8] In light of the bankruptcy filings, and in order to avoid unnecessary expenditures that would deplete valuable assets of the estate, G Companies has significantly reduced its workforce and payroll from approximately $273,000 per month in December 2007 to approximately $69,000 per month in August 2008.

[9] G Companies makes draws from the Related Debtors' accounts on a bi-weekly and/or as-needed basis to fund the regular business expenses, such as payroll, it incurs as result of those services it provides to the Companies. Invoices are not used for routine bi-weekly overhead, but unplanned expenses are invoiced and documented.

in connection with the chapter 11 cases and all tax and accounting matters. G Companies provides

oversight of the Related Debtors' business operations, as well as participating in the development

of the Related Debtors' business plans and strategies and in negotiations concerning the Related

Debtors' financial restructuring activities and implementation thereof. At this time, G Companies

is assisting the Related Debtors in finalizing several transactions involving Properties located in

Murrieta, California.

19.     In the past year, the aggregate amount transferred to G Companies in order to pay

the costs associated with its business expenses totaled approximately $517,000 per month. Due to

reductions in payroll and other expenses, based on the Cash Flow Projection, I believe that on a

going-forward basis that G Companies will require approximately $160,000 per month in order to

continue to operate. The Cash Flow Projection anticipates that Gianulias will pay 70% of the

foregoing expenses and Cameo will pay 30%.

20.     Many of these expenses are incurred by G Companies in providing services that

ultimately benefit both of the Related Debtors. I believe that it would be extremely difficult and

time-consuming to allocate between the Related Debtors the various expenses incurred by G

Companies on behalf of the Companies. In order to determine what services benefit Cameo, as

opposed to Gianulias, or visa versa, the Related Debtors would need to allocate each expense

incurred by G Companies among the Companies, then determine the Related Debtors' ownership

of each of the Companies. This process would be exceedingly complex and would, of necessity,

be artificial. For example, G Companies would be required to determine how much time each

employee of G Companies spent providing services to each of the Companies. I do not believe

that it would be a prudent use of the Related Debtors' assets to attempt to differentiate between

these expenses.

21.     Moreover, I believe that revamping the Companies' entire management and

financial structure would result in disruption and delay to the Companies, from whom the Related

Debtors receive substantially of all their income, with no corresponding benefit. The Related

Debtors and their creditors need certainty and stability as they enter these bankruptcy proceedings,

and the continued central administration of the Related Debtors' cash flow is crucial to the Related

1    Debtors' ability to manage the Companies and administer their bankruptcy cases in an efficient

2    and effective manner.

3        22.    Therefore, I believe that it is reasonable for Gianulias to pay 70% and Cameo to pay

4    30% of the foregoing expenses.

5    <div align="center">Professional Fees</div>

6        23.    The second broad category reflected in the Related Debtors' Cash Flow Projection

7    is comprised of professional fees relating to the Related Debtors' chapter 11 cases. Included in

8    this category are fees to pay the Related Debtors' insolvency counsel, as well as fees relating to

9    BMC Group, which is assisting the Related Debtors in preparing their schedules, and other

10    professionals necessary to assist the Related Debtors in maximizing the value of their assets for the

11    benefit of their creditors. I estimate that the professional fees and retainers will potentially exceed

12    $1 million for the period July through September 2008.

13        24.    There is extensive overlap among the Related Debtors' assets, liabilities and use of

14    cash. Among the most important are the following: (i) the Related Debtors centrally administer

15    the management of the assets in which both the Related Debtors own an interest, and allocate their

16    income and expenses in connection with such joint administration; (ii) they are co-obligors on

17    numerous guarantees; and (iii) they have many creditors in common. Therefore, many of the

18    services provided by the professionals will benefit both of the Related Debtors. Due to this

19    overlap, I believe it would be extremely time-consuming to allocate the various services provided

20    by the professionals between Gianulias and Cameo. Therefore, I believe it is reasonable for

21    Gianulias to pay 70% and Cameo to pay 30% of the foregoing expenses.

22        25.    Where a professional is employed by one, but not both, of the Related Debtors,

23    however, no allocation would be appropriate, or necessary.

24    <div align="center">Direct Expenses</div>

25        Both Gianulias and Cameo also have certain direct expenses which are paid independently

26    by each of the Related Debtors, however, the majority of Cameo's direct expenses are comprised

27    of payroll and related expenses, as well as costs incurred in connection with Cameo's computer

28    system, functions which benefit both Gianulias and Cameo. Although G Companies provides the

1  majority of services to the Companies, Cameo employs two individuals, including Gianulias, to

2  oversee the management of G Companies and the Companies.  These individuals provide

3  management and oversight of Cameo's business operations and the services provided by G

4  Companies and its employees.  Additionally, Gianulias provides services essential to the

5  development of Cameo's business plans and is assisting Cameo in maximizing the value of its

6  assets.  Cameo requires approximately $50,000 per month in order to operate.

7       26.    At this time, Cameo is currently securing and completing transactions involving

8  several assets in which both of the Related Debtors have an interest.  These transactions may

9  increase the value of the Related Debtors' estates by several million dollars, as well as benefiting

10  the Related Debtors by reducing their contingent guarantee liability.  The Related Debtors estimate

11  that these transactions will be completed between August 2008 and February 2009.

12       27.    Gianulias' direct expenses consist of several categories.  First, Gianulias makes

13  mortgage payments and pays other direct expenses on certain directly owned assets, including

14  property taxes, homeowner association fees, maintenance and other services, and utilities.[10]

15  Gianulias also directly pays certain business expenses, including costs associated with trade

16  publications, membership dues, business meals and membership facilities used for entertainment

17  and business development.  Finally, Gianulias has certain personal expenses, including insurance,

18  medical bills and other personal expenses.  All of these items are paid directly by Gianulias, and

19  not allocated between the Related Debtors.

20       28.    Based on the foregoing, I believe that joint administration of these cases will allow

21  the Related Debtors to benefit from increased efficiency because they will not be required to

22  review and separately respond to similar motions, disclosure statements, and other papers that

23  would otherwise be filed in the separate cases.  Joint administration will potentially save the

24

25

26

27

28    [10] Certain of the properties owned by Gianulias personally have been rented.  This rental income is applied to costs associated with the properties.

1  Related Debtors' estates thousand of dollars in administrative fees and costs, as well as save this

2  Court numerous hours in setting and hearing matters and in reviewing two separate sets of

3  virtually identical pleadings.  Therefore, I respectfully request that this Court grant the Motion.

4      I declare under penalty of perjury that the foregoing is true and correct.

5      Executed this _22_ day of July, 2008, at Newport Beach, California.

6      _____

7      John McFadden

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JAMES C. GIANULIAS**
Projected Cash Flow

| | Jul-08 | Aug-08 | Sep-08 |
|---|---|---|---|
| **BEGINNING CASH** | 223,136 | 186,818 | 241,588 |
| **SOURCES OF CASH - JCG** | | | |
| Salary (Net) | 15,785 | 15,785 | 15,785 |
| Social Security | 1,948 | 1,948 | 1,948 |
| Membership Interest Property Distributions | 217,086 | 309,928 | 318,607 |
| Partial return of less Phoenix retainer | 75,000 | | |
| **TOTAL SOURCES** | 309,819 | 327,662 | 336,341 |
| | | | |
| **USES OF CASH - JCG** | | | |
| **DEBT PAYMENTS** | | | |
| 21 Atlantis Cove | - | - | - |
| Santa Rosa Cove | - | - | - |
| Fasching Haus | - | - | - |
| Coconut Grove 1st | 15,625 | 15,625 | 15,625 |
| Coconut Grove 2nd | 4,403 | 4,403 | 4,403 |
| 48th & Adams | - | - | - |
| Old Greenwood | - | - | - |
| Total Mortgage Pmts | 20,028 | 20,028 | 20,028 |
| | | | |
| **HOME EXPENSES** | | | |
| **21 Atlantis Cove** | | | |
| HOA | 545 | 545 | 545 |
| Maintenance & Services | 1,300 | 1,300 | 1,300 |
| Utilities | 620 | 620 | 620 |
| Property Taxes | - | - | - |
| | | | |
| **Santa Rosa Cove** | | | |
| HOA | 475 | 475 | 475 |
| Utilities & Maintenance | 1,400 | 1,400 | 1,400 |
| Property Taxes | - | - | - |
| | | | |
| **Fasching Haus** | | | |
| Rental Income | (3,000) | (3,000) | (3,000) |
| Association Dues | 1,300 | 1,300 | 1,300 |
| Housekeeping | 250 | 250 | 250 |
| Utilities | 170 | 170 | 170 |
| Management Fees | 68 | 68 | 68 |
| Rental Commission | 1,200 | 1,200 | 1,200 |
| | | | |
| **Coconut Grove** | | | |
| Rental Income | (4,100) | (4,100) | (4,100) |
| HOA | 1,953 | 1,953 | 1,953 |
| Maintenance & Repairs | 250 | 250 | 250 |
| Housekeeping | 1,310 | 1,310 | 1,310 |
| Telephone | 61 | 61 | 61 |
| Utilities | 1,000 | 1,000 | 1,000 |
| Property Taxes | - | 10,221 | 1,000 |
| | | | |
| **Old Greenwood** | | | |
| Property Taxes | - | - | - |
| Association Fees | - | 434 | - |
| | | | |
| Total Home Expenses | 4,802 | 15,456 | 4,802 |
| | | | |
| **BUSINESS EXPENSES** | | | |
| Dues & Subscriptions | 3,500 | 3,500 | 3,500 |
| Entertainment & Promotion | 2,350 | 2,350 | 2,350 |
| | | | |
| Business Expenses | 5,850 | 5,850 | 5,850 |
| | | | |
| **PERSONAL EXPENSES** | | | |
| Jim's Car Lease | 4,294 | 4,294 | 4,294 |
| Accounting | - | - | - |
| Bank Charges | 85 | 85 | 85 |
| Health & Medical | 300 | 300 | 300 |
| Insurance | - | - | - |
| Miscellaneous | 100 | 100 | 100 |
| Personal Expense | 1,000 | 1,000 | 1,000 |
| Telephone | 235 | 235 | 235 |
| Travel | 3,500 | 3,500 | 3,500 |
| | | | |
| Personal Expenses | 9,514 | 9,514 | 9,514 |
| | | | |
| **TOTAL JCG G&A** | 40,193 | 50,848 | 40,193 |
| | | | |
| Professional Fees (70%) | 245,000 | 105,000 | 70,000 |
| G Company Management Allocation (70%) | 60,943 | 117,044 | 112,844 |
| Project Capital Contributions | | | |
| **TOTAL USES** | 346,137 | 272,892 | 223,037 |
| | | | |
| **NET CASH FLOW** | (36,317) | 54,770 | 113,303 |
| **ENDING CASH - JCG** | 186,818 | 241,588 | 354,892 |



Exhibit  A
Page  31

**CAMEO HOMES**
Projected Cash Flow

|  | Jul-08 | Aug-08 | Sep-08 |
|---|---|---|---|
| **BEGINNING CASH** | 5,737 | 34,619 | 76,178 |
| **SOURCES OF CASH - CAMEO** | | | |
| Membership Interest Property Distributions | 136,332 | 188,052 | 208,834 |
| Partial return of Issa Phoenix retainer | 75,000 | | |
| TOTAL SOURCES | 211,332 | 188,052 | 208,834 |
| **USES OF CASH - CAMEO** | | | |
| **PAYROLL** | | | |
| Salaries | 44,500 | 44,500 | 44,500 |
| Payroll Taxes | 2,781 | 2,781 | 2,781 |
| Payroll Service Fee | 50 | 50 | 50 |
| TOTAL PAYROLL | 47,331 | 47,331 | 47,331 |
| **GENERAL & ADMIN.** | | | |
| Accounting | - | - | - |
| Advertising/Marketing | - | - | - |
| Auto Expense | - | - | - |
| Bank Charges | - | - | - |
| Computer Equipment Lease | 4,000 | 4,000 | 4,000 |
| Dues & Subscriptions | - | - | - |
| Entertainment | - | - | - |
| License & Bonds | - | - | - |
| Maintenance & Repairs | - | - | - |
| Office Overhead & Supplies | - | - | - |
| Professional Fees | - | - | - |
| Postage/Courier | - | - | - |
| Travel | - | - | - |
| Telephone | - | - | - |
| Other | - | - | - |
| TOTAL GENERAL & ADMIN | 4,000 | 4,000 | 4,000 |
| TOTAL CAMEO G&A | 51,331 | 51,331 | 51,331 |
| Professional Fees (30%) | 105,000 | 45,000 | 30,000 |
| G Company Management Allocation (30%) | 26,119 | 50,162 | 48,362 |
| Project Capital Contributions | - | - | - |
| TOTAL USES | 182,450 | 146,493 | 129,693 |
| **NET CASH FLOW** | 28,882 | 41,559 | 79,141 |
| **ENDING CASH - CAMEO** | 34,619 | 76,178 | 155,319 |

**G COMPANIES MANAGEMENT**
Projected Cash Flow

|  | Jul-08 | Aug-08 | Sep-08 |
|---|---|---|---|
| **BEGINNING CASH** | 180,734 | 50,000 | 50,000 |
| **SOURCES OF CASH - G CO MGMT** | | | |
| Allocation from JCG (70%) | 60,943 | 117,044 | 112,844 |
| Allocation from Cameo Homes (30%) | 26,119 | 50,162 | 48,362 |
| **TOTAL SOURCES** | 87,062 | 167,205 | 161,205 |
| | | | |
| **USES OF CASH - G CO MGMT** | | | |
| Salaries & Wages | 97,472 | 68,919 | 68,919 |
| Payroll Taxes | 6,112 | 4,322 | 4,322 |
| 401K Employer Matching | 265 | 265 | 265 |
| Retention Agreement Expense | - | - | - |
| Payroll Service Fee | 250 | 250 | 250 |
| Payroll 401K Service Fee | 463 | 463 | 463 |
| **DIRECT PAYROLL** | 104,562 | 74,218 | 74,218 |
| | | | |
| Payroll per pay period | 52,281 | 37,109 | 37,109 |
| | | | |
| Consulting Fees | 33,917 | 21,000 | 15,000 |
| Workers Compensation | 4,060 | 3,100 | 3,100 |
| Health Insurance | 26,899 | 20,530 | 20,530 |
| Other Employment Fees | 750 | 750 | 750 |
| **INDIRECT PAYROLL** | 65,626 | 45,380 | 39,380 |
| | | | |
| **RENT EXPENSE** | | | |
| 1105 Quail - Corporate Offices | 22,116 | 22,116 | 22,116 |
| 1200 Quail #250 | 1,617 | 1,617 | 1,617 |
| sub-lease | (1,694) | (1,694) | (1,694) |
| 1200 Quail #260 | 3,406 | 3,406 | 3,406 |
| sub-lease | (3,406) | (3,406) | (3,406) |
| 3975 Birch (warehouse) | 3,150 | 3,150 | 3,150 |
| storage | 235 | 235 | 235 |
| **TOTAL RENT** | 25,424 | 25,424 | 25,424 |
| | | | |
| **GENERAL & ADMIN** | | | |
| Mileage Reimbursement | 500 | 500 | 500 |
| Auto Other | 500 | 500 | 500 |
| Computer Expense | 4,000 | 4,000 | 4,000 |
| Dues & Subscriptions | 450 | 450 | 450 |
| Equipment Lease | 1,034 | 1,034 | 1,034 |
| Insurance | - | - | - |
| Internet Service | 1,500 | 1,500 | 1,500 |
| Office Supplies & Expense | 5,000 | 5,000 | 5,000 |
| Postage & Delivery | 1,900 | 1,900 | 1,900 |
| Professional Fees | 3,000 | 3,000 | 3,000 |
| Telephone | 2,500 | 2,500 | 2,500 |
| Utilities | 1,500 | 1,500 | 1,500 |
| Travel & Entertainment | 300 | 300 | 300 |
| **TOTAL GENERAL & ADMIN** | 22,184 | 22,184 | 22,184 |
| | | | |
| **TOTAL USES** | 217,796 | 167,205 | 161,205 |
| | | | |
| **NET CASH FLOW** | (130,734) | - | - |
| **ENDING CASH - G CO MGMT** | 50,000 | 50,000 | 50,000 |

Distributable Project Cash Flow

|  |  |  |  | Ownership | |
| --- | --- | --- | --- | --- | --- |
| | **Jul-08** | **Aug-08** | **Sep-08** | **JCG** | **Cameo** |
| Project | | | | | |
| Piccadilly Square | - | 48,160 | 52,309 | 25.261% | 24.239% |
| Park Mesa Villas | 150,000 | 158,639 | 173,297 | 18.750% | 18.375% |
| Brooklake | 120,000 | 108,544 | 115,255 | | 49.500% |
| Villa Buena | 75,000 | 64,449 | 71,919 | 25.261% | 24.239% |
| Parkewood Village | 125,000 | 115,552 | 99,615 | 16.667% | 16.333% |
| Palm Island | 26,000 | 165,039 | 143,857 | 64.000% | |
| River Knolls | 4,000 | 7,388 | 11,684 | 85.000% | 14.000% |
| Emerald Isle | 100,000 | 70,137 | 92,535 | 69.000% | |
| Silverhawk | - | - | - | 55.250% | 1.000% |
| Vista Pointe 144 | - | - | - | 74.000% | 1.000% |
| Silverado 492 | - | - | - | 74.000% | 1.000% |
| Grand Isle 453 | - | - | - | 74.000% | 1.000% |
| La Quinta Retail/Lofts | - | - | - | 55.250% | |
| Crown Building | 45,000 | 31,633 | 28,284 | | 20.000% |
| Lucas Gianulias | 20,000 | 33,887 | 34,387 | 50.000% | |
| Greenhaven Plaza | 3,000 | 10,488 | 14,874 | 25.000% | |
| Grass Valley Shop Ctr | - | 50,329 | 65,451 | 0.010% | 98.990% |
| Coast Business Center | 65,000 | 97,617 | 78,988 | 20.733% | 1.867% |
| Dana Center GP | 5,000 | 3,459 | 4,829 | 50.000% | |
| Dana Center LP | 17,000 | 11,394 | 15,296 | 49.500% | |
| East Coast Properties | 100,000 | 100,000 | 100,000 | 25.000% | |
| | | | | | |
| JCG distributions | 217,086 | 309,928 | 318,607 | | |
| Cameo distributions | 136,332 | 188,052 | 208,834 | | |

Exhibit
Page